**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**December 29, 2015**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

## UNITED STATES COURT OF APPEALS

## TENTH CIRCUIT

---

DEBRA JONES and ARDEN C. POST, individually and as the natural parents of Todd R. Murray; DEBRA JONES, as personal representative of the Estate of Todd R. Murray, for and on behalf of the heirs of Todd R. Murray,

     Plaintiffs - Appellants,

v.

VANCE NORTON, Vernal City police officer in his official and individual capacity; VERNAL CITY; BLACKBURN COMPANY, d/b/a Thomas-Blackburn Vernal Mortuary; DAVE SWENSON, in his individual capacity; CRAIG YOUNG, in his individual capacity; REX OLSEN, in his individual capacity; JEFF CHUGG, in his individual capacity; ANTHONEY BYRON, in his individual capacity; BEVAN WATKINS, in his individual capacity; TROY SLAUGH, in his individual capacity; SEAN DAVIS, in his individual capacity; UINTAH COUNTY,

     Defendants - Appellees.

_____

DEBRA JONES, individually and as the natural parent of Todd R. Murray, and as personal representative of the

No. 14-4040

Estate of Todd R. Murray, for and on behalf of the heirs of Todd R. Murray; ARDEN C. POST, individually and as the natural parent of Todd R. Murray,

     Plaintiffs - Appellants,

v.

VANCE NORTON, Vernal City police officer in his official and individual capacity; VERNAL CITY; BLACKBURN COMPANY, d/b/a Thomas-Blackburn Vernal Mortuary; DAVE SWENSON, in his individual capacity; CRAIG YOUNG, in his individual capacity; REX OLSEN, in his individual capacity; JEFF CHUGG, in his individual capacity; ANTHONEY BYRON, in his individual capacity; BEVAN WATKINS, in his individual capacity; TROY SLAUGH, in his individual capacity; SEAN DAVIS, in his individual capacity; UINTAH COUNTY,

     Defendants - Appellees.

No. 14-4144

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH**
**(D.C. Nos. 2:09-CV-00730-TC-EJF and 2:09-CV-00730-TC-BCW)**

---

Frances C. Bassett and Jeffrey S. Rassmussen (Thomas W. Fredericks, Jeremy J. Patterson, Martha L. King, and Matthew J. Kelly, and Todd K. Gravelle, with them on the briefs), of Fredericks Peebles & Morgan LLP, Louisville, Colorado, for Plaintiffs-Appellants.

J. Clifford Petersen, Assistant Attorney General for the State of Utah (Sean D. Reyes, Utah Attorney General, with him on the brief), Salt Lake City, Utah, for State Defendants-Appellees, Dave Swenson, Craig Young, Rex Olsen, Jeff Chugg and Sean Davis.

Jesse C. Trentadue (Britton R. Butterfield with him on the brief) of Suitter Axland PLLC, Salt Lake City, Utah, for Defendants-Appellees Vance Norton, Vernal City, Anthoney Byron, Bevan Watkins, Troy Slaugh and Uintah County.

Nathan R. Skeen (Julianne P. Blanch and Robert W. Thompson, with him on the brief), of Snow, Christensen & Martineau, Salt Lake City, Utah, for Defendant-Appellee Blackburn Company, Inc.

---

Before **BRISCOE, McKAY** and **BACHARACH**, Circuit Judges.

---

**BRISCOE**, Circuit Judge.

---

This case arises from the death of Ute Tribe member Todd R. Murray on April 1, 2007, following a police pursuit. Murray's parents Debra Jones and Arden Post, on behalf of themselves and Murray's estate, brought a 13-count complaint in the district court alleging various constitutional violations under 42 U.S.C. § 1983, conspiracy to violate civil rights under 42 U.S.C. § 1985, and state tort claims. These claims were alleged in varying permutations against nine individual law enforcement officers, their government employers, and a private mortuary (collectively, "Defendants"). Plaintiffs also sought sanctions against Defendants for alleged spoliation of evidence. The district court granted summary judgment to the mortuary on Plaintiffs' emotional distress claim, and to

3

all remaining Defendants on all federal claims. The court also dismissed as moot

Plaintiffs' motion for partial summary judgment on the status of Indian lands, and

denied Plaintiffs' motion for spoliation sanctions. The district court declined to

exercise supplemental jurisdiction over the remaining state law torts after

disposing of the emotional distress claim and the federal claims. Costs were

taxed in favor of Defendants, and the court denied Plaintiffs' motion to reconsider

the taxation of those costs. Plaintiffs now appeal all of these rulings in two

appeals. In Case No. 14-4040, we affirm the district court on each issue. As

regards Case No. 14-4144, we affirm the district court's denial of sanctions

against the City of Vernal, but we dismiss the appeal of taxation of costs because

we lack appellate jurisdiction.

# I

On the morning of April 1, 2007, Trooper Dave Swenson of the Utah

Highway Patrol was involved in a high-speed chase of a vehicle in which Murray

was the passenger. At some point during the chase, Swenson conveyed to

dispatch that the driver appeared to be a tribal male. The driver eventually ran

off the road in a remote desert area within the Ute Tribe's Uncompahgre

Reservation ("Reservation"). Trooper Swenson, who was in uniform, got out of

his patrol car and shouted at the two men to stop and get on the ground. Plaintiffs

contend that Murray paused for a moment before running from the car, but the

trooper's dashboard camera video reveals no perceptible pause. Swenson did not

4

see any weapons in Murray's hands or waistband. Murray and the driver ran in opposite directions, and Swenson notified dispatch that two "runners," both "tribal males," had fled on foot. Swenson pursued the driver, eventually arresting him.

Three nearby officers responded quickly to the chase: off-duty City of Vernal Police Detective Vance Norton, Utah Highway Patrol Trooper Craig Young, and Uintah County Sheriff's Deputy Anthoney Byron. When these officers arrived, Swenson pointed them in Murray's direction. Norton, Byron, and Young then began searching the desert for Murray. None of these officers were cross-deputized to exercise law enforcement authority on the Reservation.

The search ended when Murray suffered a fatal gunshot wound to the head. Plaintiffs contend that Detective Norton shot Murray, but Defendants contend that Murray shot himself. Norton testified that as he crested a hill on foot, he saw Murray and shouted, "Police, get on the ground." App. Vol. III at 2410. Norton was wearing plain clothes, and estimates he was approximately 140 yards away from Murray. Murray did not get on the ground, but instead ran in Norton's general direction. As Murray drew closer, Murray fired a shot at Norton, which landed near Norton's feet. Detective Norton returned fire, shooting twice in rapid succession, and ran back up the hill he had just come down. When he reached what he believed to be a safe distance, he began to dial dispatch on his cell phone. While Norton attempted this call, he saw Murray "put the gun to his head. And I

5

think I told him–once or twice screamed, you know, [p]ut the gun down, and then he pulled the trigger, and he just went straight down." App. Vol. XI at 3236. A later investigation conducted by the Federal Bureau of Investigation (FBI), which has exclusive jurisdiction to investigate incidents on the Reservation involving non-tribal law enforcement officers, revealed that Detective Norton's .40 caliber shell casings were 113 yards from where Murray was shot. When Norton reached dispatch, he notified them that Murray "just shot himself in the head" and requested an ambulance. App. Vol. VI at 1827.

In the meantime, before shots were fired, Deputy Byron and Trooper Young were also searching for Murray. Byron testified that he and Young were walking through a gully, and saw Norton standing on the top of a hill. Byron heard "some crackling noise," but was not sure if it was a gunshot. App. Vol. VIII at 2420. As they made their way through the gully, Byron saw Murray "walking, and . . . swinging his arms." Id. Byron could not tell whether Murray was holding anything. Byron then again heard "crackling," could no longer see Detective Norton, and saw Murray "go[] from walking to going down." Id. Byron estimated he was at least 200 yards from Murray, and 400 to 500 yards from where he saw Norton on the top of the hill. He did not see anyone else.

Byron and Young then reunited with Norton on the hill where they had just seen him. Byron and Young proceeded down the hill, guns drawn, to where Murray was lying. Murray was on his back, bleeding from a gunshot wound to

6

the head. He was unconscious, but still breathing. Trooper Young testified that he saw a .380 caliber gun and casings on the ground near Murray. Byron rolled Murray from his back onto his side and handcuffed him while Young kept his weapon aimed at Murray. None of the officers attempted to provide first aid or any other assistance. Murray remained unconscious, lying on his right side and handcuffed, until the ambulance arrived.

Plaintiffs vehemently dispute Detective Norton's and Deputy Byron's testimony that Murray shot himself. Plaintiffs believe Norton shot Murray "execution-style" at close range and planted the .380 caliber gun found near Murray's body. To support their theory, Plaintiffs point principally to the fact that Murray was right-handed, but the shot entered the left side of his head. Plaintiffs' various experts in police procedures opined that a conclusion that a right-handed person inflicted a gunshot wound to the left side of his own head is suspicious, and it is usually necessary to corroborate that conclusion with other forensic trace evidence, such as blood blowback on the victim's hands.

The remaining individual Defendants arrived either in the half hour before the ambulance arrived, or shortly after the ambulance took Murray to the hospital and their minor involvement need not be recited. These Defendants are: Division of Wildlife Resource Investigator Sean Davis, Uintah County Sheriff's Deputies Troy Slaugh and Bevan Watkins, Utah Highway Patrol Trooper Rex Olsen, and Utah Highway Patrol Lieutenant Jeff Chugg.

7

Agent Rex Ashdown, the FBI agent assigned to the investigation, arrived after Murray was taken to the hospital. Neither the FBI, nor any FBI agents are named defendants in this lawsuit. According to Ashdown, officers at the scene told him that Murray shot himself, and this "influence[d]" how he went about the investigation. App. Vol. XVII at 5545. Ashdown admits he took some information from the officers "at face value." Id. at 5560. Agent Ashdown: (1) took custody of the .380 gun and shell casings found near Murray, but did not order any testing; (2) did not confiscate Detective Norton's gun or order any testing; and (3) did not confiscate either Murray's or any of the officers' clothing, testifying later that Norton's clothes and hands appeared clean. Agent Ashdown retired about two months later.

After Agent Ashdown retired, FBI Agent David Ryan took over the investigation of Murray's death. The FBI later used the .380 caliber weapon as evidence in an unrelated prosecution, and the gun was destroyed after the conclusion of that prosecution pursuant to a court order in that case. Although Agent Ryan knew the gun was evidence in an officer-involved shooting, he did not notify the Utah Highway Patrol, the Uintah County Sheriffs, or the City of Vernal Police that it was going to be destroyed. Nor did he attempt to prevent the gun from being destroyed.

Detective Norton's gun and shell casings were recovered from the scene. As far as the record reveals, the casings are still in the possession of Vernal City

8

police.  After Murray's death, Vernal Chief of Police Greg Jensen, not a defendant here, inspected Norton's gun visually, kept it for several days, and then returned it to Norton.

While the investigation at the scene was underway, Murray was taken to a hospital in Vernal, Utah, where he was pronounced dead.  Deputy Byron, who had accompanied the ambulance to the hospital, was joined there by two other officers who are not defendants in this action.  After Murray's death, the three men began what they later claimed was evidence collection: taking photographs of Murray's body, gathering his clothing in bags, and putting bags over Murray's hands.  A member of the hospital staff drew a vial of blood from Murray's body at the officers' request.  One of the officers took Murray's clothes and the blood, but it is unknown what became of these items.

Deputy Byron placed his index finger in both of Murray's head wounds. According to Byron, he did this to determine the location of the entrance wound and the exit wound.  But Plaintiffs' experts testified that this tampering was not only unusual, but potentially harmful to the investigation.  One expert stated that in his thirty years of experience in police practices, he had "never heard or seen an instance where a law enforcement officer inserted a finger into a gunshot wound prior to examination by the medical examiner," which "can introduce contamination, remove evidence and alter the appearance of the wound."  App. Vol XVIII at 5688.  Even experts retained by Defendants agreed that there was no

9

reason for the "turning, moving of limbs, [and] undressing" of Murray, and that probative trace evidence could have been lost as a result. App. Vol VI at 1628–29. Nonetheless, Dr. Edward Leis, the Deputy Medical Examiner who performed the official medical examination of Murray's body, testified that any potential contamination caused by the officers' meddling would not have altered his determination regarding the location of the entry and exit wounds or his conclusion that Murray died of a self-inflicted gunshot wound. Dr. Leis is not a defendant in this action.

Murray's body was transported from the hospital to The Blackburn Company ("Blackburn"), a mortuary and funeral home, where it was kept until the medical examiner's office could retrieve it the following day. Colby DeCamp, a mortuary apprentice, was asked by law enforcement officers to draw blood. DeCamp, who is also not a defendant in this action, testified that he remembered at least the following officers were present: Chief Jensen, Detective Norton, and Keith Campbell (a Deputy Medical Examiner and a Deputy Sheriff, not a defendant). In order to draw the blood, DeCamp made an incision in Murray's neck, which he testified is a common practice used to draw blood from deceased persons who have sustained significant blood loss. After drawing the blood, DeCamp immediately gave the sample to the officers, but it is unknown what became of the blood sample after that. Plaintiffs described the incision as a "jagged-gash" on Murray's remains. App. Vol. IV at 1231. Plaintiffs believe the

10

incision in the neck was an effort to send a threatening message to Murray's family, but DeCamp testified that he did not know Murray or his family, nor did he believe that the incision would cause emotional distress.

The following day, Murray's body was taken to the Utah State Office of the Medical Examiner where Dr. Leis performed an examination. Dr. Leis testified that he did not believe Murray's injury was survivable, or at least Murray would have remained "in a chronic vegetative state," App. Vol. XVII at 5537, and thus the officers who were at the scene could not have saved his life by administering aid. Plaintiffs' forensics experts opined that "many victims of gunshot injuries to the head survive," App. Vol. XIII at 3789, and that Murray's injury "would not be considered universally . . . fatal," App. Vol. XVIII at 5687, but these experts did not offer evidence that Murray's particular injury was surviveable.

Although Agent Ashdown requested that a full autopsy be performed, Dr. Leis decided to conduct only an external physical examination. According to Dr. Leis, after performing the external physical examination and reading a preliminary report prepared by Keith Campbell the prior evening, he concluded that a full autopsy was unnecessary. A full autopsy might have revealed more information about the trajectory and type of bullet that killed Murray, as well as whether there was any evidence of a struggle which may have preceded his death.

Dr. Leis determined that the wound on the left side of Murray's head was the entrance wound and that the wound on the right was the exit wound. Because

11

of soot in the entrance wound and surrounding abrasions to the skin, Dr. Leis concluded that the gun was in close proximity to the skin when it was discharged, and described the entry wound as a "contact wound." Id. at 3364. Dr. Leis completed a death certificate that listed the cause of Murray's death as suicide resulting from a gunshot wound to the head.

## II

Following Murray's death, Plaintiffs filed a civil suit in Utah state court, which included numerous claims. The State of Utah, no longer a party, removed the action to federal court. After entering several rulings, the district court has now disposed of all claims contained in the Plaintiffs' third and final amended complaint. The district court first entered summary judgment in favor of Blackburn on Plaintiffs' claim of intentional infliction of emotional distress. The district court also twice denied Plaintiffs leave to amend their emotional distress claim. The district court then ruled that the United States' treaty with Murray's tribe, the Ute, did not give rise to a private right of action against municipalities or individuals enforceable through 42 U.S.C. § 1983, and dismissed that count on the pleadings. The district court then issued a trio of opinions, granting summary judgment to all municipal and individual Defendants on the remaining civil rights claims (unlawful seizure, excessive force, failure to intervene, and conspiracy), dismissing the remaining state tort claims, and dismissing as moot Plaintiffs' motion for partial summary judgment on the status of Indian lands. The district

12

court also denied Plaintiffs' motion to reconsider an earlier ruling that the Utah Governmental Immunity Act applies to the defendant officers. Finally, the district court denied Plaintiffs' request for sanctions against all individual Defendants and Uintah County for alleged spoliation of evidence, but reserved judgment on whether the City of Vernal might be liable for sanctions. After further argument, the district later denied those sanctions as well.

After the entry of final judgment in this case, the district court taxed costs against Plaintiffs. Plaintiffs' subsequent request for reconsideration of the taxation of costs was denied. We conclude we have jurisdiction under 28 U.S.C. § 1291 to address all issues raised in both Case Nos. 14-4040 and 14-4144, except the taxation of costs.

### III

We have divided Plaintiffs' substantive and procedural claims into the following groups: (1) 42 U.S.C. § 1983 claims for unlawful seizure, excessive use of force, and failure to intervene in the violation of constitutional rights; (2) 42 U.S.C. § 1983 claim for violation of individual rights under the Ute Treaty; (3) 42 U.S.C. § 1985 claim for conspiracy to violate civil rights; (4) state law tort claims of intentional infliction of emotional distress, wrongful death, and assault and battery; (5) spoliation sanctions; and (6) taxation of costs.

*1. Unlawful seizure, excessive force, and failure to intervene*

The district court granted summary judgment to all Defendants on

13

Plaintiffs' claims of unlawful seizure, excessive force, and failure to intervene in the ongoing violation of constitutional rights, all brought under 42 U.S.C. § 1983. We review the grant of summary judgment de novo. Tabor v. Hilti, Inc., 703 F.3d 1206, 1215 (10th Cir. 2013). We view the facts in the light most favorable to the nonmovant and draw all reasonable inferences in the nonmovant's favor. Id. Summary judgment is appropriate only if "there is no genuine dispute as to any material fact." Id. (quoting Fed. R. Civ. P. 56(a)). "A fact is 'material' if, under the governing law, it could have an effect on the outcome of the lawsuit. A dispute over a material fact is 'genuine' if a rational jury could find in favor of the nonmoving party on the evidence presented." Id. (quoting Equal Emp't Opportunity Comm'n v. Horizon/CMS Healthcare Corp., 220 F.3d 1184, 1190 (10th Cir. 2000)).

We first dispense with Plaintiffs' unlawful seizure claims, and the remaining constitutional claims unravel from there. Plaintiffs argue that Detective Norton, Trooper Young, and Deputy Byron seized Murray without probable cause or reasonable suspicion. They also allege these officers, along with Trooper Swenson, unconstitutionally pursued and seized Murray on Reservation land where they have no jurisdiction, even if arguably they had cause. Plaintiffs argue further that the officers' employers, Uintah County and the City of Vernal, failed to properly train and supervise the officers, or alternatively, implemented policies and procedures that were deliberately

14

indifferent to Murray's rights.

In order for Plaintiffs to succeed on their unlawful seizure claims, there must have been a seizure which invokes the protections of the Fourth Amendment. A seizure occurs when "an individual remains in the control of law enforcement officials because he reasonably believes, on the basis of their conduct toward him, that he is not free to go." Michigan v. Chesternut, 486 U.S. 567, 577 (1988).

Plaintiffs contend the following events are seizures: (1) Trooper Swenson's order to Murray to get on the ground at the conclusion of the car chase, (2) the search for, and closing in on Murray, and (3) Murray's fatal gunshot wound, which Plaintiffs believe was inflicted by Detective Norton, not Murray himself. The district court ruled that no reasonable jury could find for Plaintiffs on any of these theories.[1]

Plaintiffs' first theory is that Murray "momentarily halted" when Trooper Swenson commanded him to stop as he got out of the pursued vehicle. Aplt. Br. at 40. But the dashboard camera video demonstrates that there was no submission, not even an ephemeral one. See California v. Hodari D., 499 U.S. 621, 626 (1991) (explaining that an officer's command to halt is not a seizure

---

[1] It is undisputed that Deputy Byron's handcuffing Murray was an unlawful seizure of a tribal member on tribal land. See Ross v. Neff, 905 F.2d 1349, 1353–54 (10th Cir. 1990). The district court ruled that Byron was entitled to qualified immunity. Plaintiffs do not challenge this ruling on appeal.

15

until the person actually submits to the command); Scott v. Harris, 550 U.S. 372, 380 (2007) (in the context of a videotape: "[W]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should adopt that version of the facts for purposes of ruling on a motion for summary judgment."). Thus, we conclude, Swenson never seized Murray.

Second, Plaintiffs argue that, under a totality of the circumstances, the officers had seized Murray in the moments before Murray was shot, even if he shot himself. Aplt. Br. at 40 (citing Jones v. Hunt, 410 F.3d 1221, 1226 (10th Cir. 2005) (reciting several factors which contribute to a seizure)). In relevant part, Jones points out that the threatening presence of officers, brandishing of a weapon, aggressive tone of voice, interaction in a nonpublic place, and absence of other members of the public can contribute to finding a seizure. 410 F.3d at 1225–26. Here, Detective Norton, who was in a remote area but at a distance from Murray, ordered Murray to the ground. It is also reasonable to infer from Deputy Byron's testimony that he and Trooper Young could see Murray, that Murray reciprocally was aware of Byron and Young as well. It is also undisputed that Norton fired two shots at Murray.

However, no reasonable jury could find a seizure had occurred in the moments before shots were fired because there is no evidence that Murray ever submitted to any show of authority. Even if one assumes Murray heard Norton's

16

shouts from over 100 yards away, Norton testified that Murray began running toward him and fired at him, rather than submitting. Additionally, even if we assume Murray was aware of Byron and Young in the other direction, there is no indication that Murray submitted to their presence. Nothing in the officers' actions "terminate[d] [Murray's] movement" or otherwise caused the officers "to have physical control" over Murray. See Brooks v. Gaenzle, 614 F.3d 1213, 1223–24 (10th Cir. 2010).[2]

Finally, Plaintiffs argue that Murray did not shoot himself, but that Detective Norton shot him at close range, thereby effectuating a seizure. Our best understanding of Plaintiffs' theory is this: Norton had the .380 weapon found near Murray, caught up to Murray either in his vehicle or on foot, used either the .380 or his .40 caliber weapon to shoot Murray at close range, and planted the .380 near Murray. To support this theory, Plaintiffs offer these facts: (1) that Murray was right-handed, but the entrance wound was on the left side of his head; (2) Trooper Swenson did not see any weapons on Murray when he ran from the car; and (3) no blood or tissue "blowback" was documented on Murray's left hand or on the .380 firearm recovered near him.

These facts could not lead a reasonable jury to conclude that Detective

---

[2] Plaintiffs argue that if Murray shot himself, his suicide would constitute a seizure because it was motivated by being "caught." Aplt. Br. at 41 n.74; Aplt. Reply Br. at 19. However, Plaintiffs provided no authority upon which to base such a conclusion.

Norton inflicted Murray's fatal contact wound. To the contrary, this extensive record could only lead a reasonable jury to conclude that no other person, including Detective Norton, was within 100 yards of Murray when he was shot, and so Murray is the only person who could have inflicted a contact wound. Norton testified that he saw Murray shoot himself from an estimated 140 yards away. Plaintiffs argue that Norton's testimony should be disregarded because he is the accused officer. But even if this court were to disregard Norton's testimony, the remainder of Defendants' evidence remains uncontroverted. Deputy Byron testified that he heard crackling and saw Murray fall to the ground immediately after seeing Detective Norton on a hill at a distance from Murray. Agent Ashdown found two shell casings from Norton's gun 113 yards away from where Murray fell, and observed that Norton had no blood on him when he was seen immediately after Murray was shot. Plaintiffs do not contest the medical evidence that Murray died of a contact wound, and Plaintiffs fail to present any evidence that anyone else got close to Murray. Thus, although the question of who inflicted Murray's fatal gunshot wound is certainly material, there is no genuine dispute of fact that the shooter was anyone but Murray himself.

Without a seizure, there can be no violation of the Fourth Amendment and therefore no liability for the individual Defendants. In the absence of a seizure we need not address the tribal status of lands on which the purported seizures occurred. As for the City of Vernal and Uintah County, "[w]hen there is no

18

underlying constitutional violation by a[n] . . . officer, there cannot be an action

for failing to train or supervise the officer." Apodaca v. Rio Arriba Cty. Sheriff's

Dep't, 905 F.2d 1445, 1447–48 (10th Cir. 1990) (citing City of Los Angeles v.

Heller, 475 U.S. 796, 799 (1986)).

Additionally, without a seizure, there can be no claim for excessive use of

force in effectuating that seizure.  See County of Sacramento v. Lewis, 523 U.S.

833, 843–44 (1998).  That leaves Plaintiffs' claim of excessive use of force in

violation of the Due Process Clause of the Fourteenth Amendment.[3]  Id.  The core

concept of due process protection against excessive use of force is the protection

against government action which is arbitrary or "shocks the conscience."  Id. at

845–46. "[O]nly the most egregious official conduct can be said to be 'arbitrary

in the constitutional sense.'"  Id. at 846 (quoting Collins v. City of Harker

Heights, 503 U.S. 115, 129 (1992)).

As the application of force, Plaintiffs point to "brandish[ing] and

threaten[ing] deadly force," apparently referring to Norton firing at Murray, and

Byron and Young approaching him with their guns drawn after he was down.

Aplt. Br. at 43.  Plaintiffs attempt to rely on Black v. Stephens, 662 F.2d 181 (3d

Cir. 1981), to argue the officers here used excessive force.  However, Black is

---

[3] Although Plaintiffs briefed for this court the protections of substantive due process under the Fifth Amendment, we interpret their arguments under the Fourteenth Amendment because they seek relief against state, rather than federal, actors.

19

unhelpful to Plaintiffs because there, a plainclothes detective, who did not identify himself, aimed his service weapon at a man's head in an unprovoked road rage incident, with the man's wife also in the line of fire. 662 F.2d at 183–85. Here, Plaintiffs offered no evidence to counter Detective Norton's testimony that Murray fired first and Detective Norton returned fire. With respect to Deputy Byron and Trooper Young's armed approach of Murray after he was down, Murray was unconscious and would not have been aware of the weapons, nor did the officers apply any force directly to Murray.[4] The record contains no evidence that these two officers ever fired at or verbally threatened Murray.

Therefore, nothing about the officers' approach toward Murray shocks the conscience or was arbitrary. We affirm the district court's grant of summary judgment to Defendants on the excessive force claim. As with the unlawful seizure claims, the municipalities are not liable in the absence of a constitutional violation. Apodaca, 905 F.2d at 1447–48.

Without either an unlawful seizure or an excessive use of force, Plaintiffs' claim that the nine individual Defendants are liable for a failure to intervene in the violation of constitutional rights also fails. In order to be liable for failure to intervene, the officers must have "observe[d] or ha[d] reason to know" of a constitutional violation and have had a "realistic opportunity to intervene."

---

[4] Deputy Byron did handcuff Murray, but Plaintiffs do not argue on appeal that he used excessive force in doing so.

20

Vondrak v. City of Las Cruces, 535 F.3d 1198, 1210 (10th Cir. 2008) (quoting Anderson v. Branen, 17 F.3d 552, 557 (2d Cir. 1994)).

Plaintiffs focus their arguments on the officers' opportunities to intervene, but ignore the requirement that the officers must have knowledge of a constitutional violation. While this court has not directly stated as much, other circuits have acknowledged that "[i]n order for there to be a failure to intervene, it logically follows that there must exist an underlying constitutional violation[.]" See Harper v. Albert, 400 F.3d 1052, 1064 (7th Cir. 2005). We are unaware of any failure to intervene case in which this court has reversed either a grant of summary judgment or qualified immunity to a government actor without first finding at least a genuine issue of material fact as to an underlying constitutional violation. Cf. Estate of Booker v. Gomez, 745 F.3d 405, 422–23 (10th Cir. 2014) (denying summary judgment and qualified immunity to government defendants on failure to intervene in excessive use of force where plaintiffs' genuinely disputed facts, if true, would constitute a clearly established excessive use of force); Casey v. City of Fed. Heights, 509 F.3d 1278, 1283–85 (10th Cir. 2007) (reversing grant of summary judgment to government defendants on failure to intervene claim where genuine issues of material fact remained on excessive use of force claim). We therefore affirm the district court's grant of summary judgment to Defendants on the failure to intervene claim.

*2. Violation of Ute Treaty*

Plaintiffs brought a claim under 42 U.S.C. § 1983, alleging that all of the individual Defendants violated Murray's rights under the "Ute Treaty"[5] between the Ute Tribe and the United States. The district court dismissed the Treaty claim on the pleadings, concluding that the Ute Treaty does not confer an individual right for which § 1983 provides a remedy against individuals or municipalities. Instead, the district court concluded, the Treaty only creates an individual right against the United States, which must be enforced directly through the Treaty itself. We review a dismissal for failure to state a claim de novo. Seattle-First Nat'l Bank v. Carlstedt, 800 F.2d 1008, 1011 (10th Cir. 1986).

Section 1983 is not an independent source of rights, but rather a vehicle through which one may vindicate rights conferred elsewhere in the Constitution and laws of the United States. Gonzaga Univ. v. Doe, 536 U.S. 273, 285 (2002). It is the violation of these federally-conferred rights, not merely violations of federal law, which give rise to § 1983 actions. Id. at 282–83. Plaintiffs argue these rights arise here from the "Bad Men Clause"[6] of the Ute Treaty:

---

[5] Two treaties comprise the "Ute Treaty" at issue here. An 1863 Treaty created the Uncompahgre Reservation, and an 1868 Treaty contains the language Plaintiffs argue confers a right enforceable via § 1983. See Treaty with the Utah Tabeguache Band, Oct. 7, 1863, 13 Stat. 673; Treaty with the Ute, art. 6, Mar. 2, 1868, 15 Stat. 619. As Plaintiffs do, we read the two treaties together, referring to them as one "Ute Treaty."

[6] Several treaties between the United States and various Native American

(continued...)

22

> If bad men among the whites or among other people, subject to the authority of the United States, shall commit any wrong upon the person or property of the Indians, the United States will, upon proof made to the agent and forwarded to the Commissioner of Indian Affairs at Washington City, proceed at once to cause the offender to be arrested and punished according to the laws of the United States, and also reimburse the injured person for the loss sustained.

Treaty with the Ute, art. 6, Mar. 2, 1868, 15 Stat. 619.

Even though the Treaty can be read to grant individual rights to Ute members, the text is clear that those rights only arise directly *against the United States*, and must be enforced through the mechanism prescribed in the Treaty, rather than the general § 1983 remedy. The remedy for Plaintiffs' claimed wrongs is that "the *United States will . . . reimburse* the injured person for the loss sustained" and cause the "bad men" to be arrested if his acts were criminal. Treaty with the Ute, 15 Stat. at 620 (emphasis added).

Other courts have come to the same conclusion on similar Bad Men Clauses.[7] E.g., Hebah v. United States, 428 F.2d 1334, 1335–36, 1339–40 (Ct.

_____

[6](...continued)
tribes contain similar or identical language, commonly referred to as a "Bad Men Clause." See Lillian Marquez, Making Bad Men Pay: Recovering Pain and Suffering Damages for Torts on Indian Reservations under the Bad Men Clause, 20 Fed. Cir. B.J. 609, 610–13 (2010–2011).

[7] The Court of Federal Claims, in parallel litigation to this case, ruled that it had jurisdiction pursuant to the Ute Treaty Bad Men Clause to address at least some of Plaintiffs' claims against the individual defendants here, as well as the FBI and Bureau of Indian Affairs officials involved. Jones v. United States, 122 Fed. Cl. 490, 517–23 (Fed. Cl. July 30, 2015), appeal docketed, No. 15-5148 (Fed. Cir. Sept. 10, 2015). The Court of Federal Claims dismissed the action,

(continued...)

23

Cl. 1970) (holding for the first time that the Bad Men Clause does give rise to individual rights, and plaintiff could sue the United States directly for reimbursement of damages she suffered from her husband's death at the hands of the Indian Police Force); Tsosie v. United States, 825 F.2d 393, 394, 398 (Fed. Cir. 1987) (holding that an identical Bad Men Clause permitted individual "reimbursement from the federal treasury" after suffering an assault at the hands of a U.S. Public Health Service hospital employee); Elk v. United States, 87 Fed. Cl. 70, 72–73, 78–79 (Fed. Cl. 2009) (permitting a member of the Oglala Sioux Tribe to recover directly from the United States under an identically worded treaty for an assault perpetrated by a U.S. Army recruiter).

This reading of the Ute Treaty also comports with the Supreme Court's statements that a well-developed enforcement mechanism granted directly through a statute will foreclose the ability to pursue a § 1983 action. See Gonzaga, 536 U.S. at 284–85 n.4; Wright v. City of Roanoke Redevelopment & Hous. Auth., 479 U.S. 418, 423, 426 (1987) (noting that where a comprehensive scheme provided for private actions, Congress expressed an intent to foreclose remedies under § 1983, but where the statute or its regulations had "never provided a procedure by which [persons] could complain . . . about the alleged [violations],"

---

[7](...continued)
however, because the district court's factual findings in this case resulted in issue preclusion. Id. at 523–30.

§ 1983 action was not precluded); <u>Middlesex Cty. Sewerage Auth. v. Nat'l Sea Clammers Ass'n</u>, 453 U.S. 1, 20 (1981).

While Plaintiffs cite several cases which they argue support their filing of a § 1983 action to enforce their treaty rights, each of these cases either hold that the treaties at issue do not provide a § 1983 remedy, or grant a § 1983 remedy based on treaty language that is not present in the Ute Treaty. <u>E.g.</u>, <u>Hoopa Valley Tribe v. Nevins</u>, 881 F.2d 657, 662–63 (9th Cir. 1989) (finding no § 1983 remedy); <u>Mille Lacs Band of Chippewa Indians v. Minnesota</u>, 853 F. Supp. 1118, 1122, 1125–26 (D. Minn. 1994) (permitting a § 1983 action based on "the privilege of hunting, fishing, and gathering"). If anything, these cases stand for the accepted premise that the specific language of a treaty determines whether that treaty gives rise to a § 1983 remedy. We agree with the district court that the Ute Treaty does not provide for a § 1983 remedy, and affirm the district court's dismissal of Plaintiffs' treaty violation claim.

*3. Conspiracy to violate civil rights under 42 U.S.C. § 1985(2) and (3)*

Plaintiffs claim that the individual Defendants conspired to obstruct justice, and to violate Murray's civil rights, in violation of 42 U.S.C. § 1985(2) and (3), respectively. The district court granted summary judgment to Defendants on both conspiracy claims.

The relevant portion of § 1985(2) provides a right of action "if two or more persons conspire for the purpose of impeding, hindering, obstructing, or

25

defeating, in any manner, the due course of justice in any State or Territory, with intent to deny to any citizen the equal protection of the laws."  42 U.S.C. § 1985(2).  Section 1985(3), clause 1, provides a right of action "[i]f two or more persons in any State or Territory conspire . . . for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws." 42 U.S.C. § 1985(3).

Among other elements, both causes of action require a showing of "some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action."  Griffin v. Breckenridge, 403 U.S. 88, 102 (1971); see also Murray v. City of Sapulpa, 45 F.3d 1417, 1423 (10th Cir. 1995); Smith v. Yellow Freight Sys., Inc., 536 F.2d 1320, 1323 (10th Cir. 1976).  The focus of the racial animus inquiry is the government actor's "intent, motive, or purpose."  Pueblo Neighborhood Health Ctrs., Inc. v. Losavio, 847 F.2d 642, 647 (10th Cir. 1988).  To avoid summary judgment, Plaintiffs must point to "specific, nonconclusory evidence" that the Defendants' actions were "improperly motivated."  Id. at 650.

Plaintiffs' only support for their racial animus theory is that some of the officers were aware of Murray's race, there was "significant racial tension" in the local culture, and that "[t]he only plausible explanation for the abusive way that [Defendants] handled every aspect of this incident," and the "brazen and flagrant" "evidence tampering" is "racial bias."  App. Vol. XVIII at 5791.  These facts,

26

even if fully accepted and considered together, do not amount to the specific, nonconclusory evidence of invidiously race-based animus required to avoid summary judgment on a conspiracy claim. Trooper Swenson's identification of the vehicle's occupants as "tribal males" to dispatch was merely descriptive. There is no evidence that Norton, Byron, or Young pursued Murray on foot because of his race, even if we assume they heard Trooper Swenson identify the vehicle's occupants as such. The remaining officers arrived well after Murray was shot, and there is no evidence that their behavior was based on racial or any other animus. We therefore affirm summary judgment in favor of the individual Defendants on Plaintiffs' § 1985(2) and (3) claims.

*4. State law torts*

Plaintiffs brought a claim of intentional infliction of emotional distress ("IIED") against Blackburn, and claims of wrongful death and assault and battery against Detective Norton. We first address the IIED claim.

Plaintiffs alleged that Blackburn, the funeral home and mortuary where Murray's body was temporarily housed on the day of his death, is vicariously liable for emotional distress they experienced based on their later seeing the incision made on Murray's neck. The district court granted Blackburn summary judgment, and denied Plaintiffs leave to amend their IIED claim.

When a plaintiff is not present during the allegedly tortious act, Utah law requires, among the other elements of an IIED claim, that the defendant

27

committed the act with the intention of inflicting injury upon the absent plaintiff. Hatch v. Davis, 147 P.3d 383, 388 (Utah 2006). Plaintiffs' IIED claim fails because it is undisputed that they were not present when the incision was made and they cannot demonstrate that Blackburn apprentice Colby DeCamp intended to inflict any injury upon Plaintiffs. DeCamp testified that he did not know Murray or the Plaintiffs at the time, and that he made the incision only at the request of law enforcement officers to obtain a blood sample. Plaintiffs do not dispute this testimony, but merely argue "the very nature of the desecration itself," i.e., the appearance of the incision, satisfies the "presence" requirement. Aplt. Br. at 52. But Plaintiffs offer no authority to support this argument. Summary judgment in favor of Blackburn on the IIED claim is affirmed.

Relatedly, Plaintiffs take issue with the district court's denial of their two requests for leave to amend their complaint with respect to the IIED claim. In general, leave to amend a complaint should be freely granted "when justice so requires." Fed. R. Civ. P. 15(a)(2). However, if the amendment would be futile, we will uphold the denial of a requested amendment. Full Life Hospice, LLC v. Sebelius, 709 F.3d 1012, 1018 (10th Cir. 2013). A denial of leave to amend a complaint is reviewed for abuse of discretion. Id. Where the reason for denial of leave to amend is futility, we review de novo the legal basis for the finding of futility. Id.

Plaintiffs first sought leave to add DeCamp and Vernal Police Chief Greg

28

Jensen individually as defendants in the IIED claim. Adding DeCamp and Jensen would be futile because the statute of limitations had already run when Plaintiffs sought this amendment. Cabaness v. Thomas, 232 P.3d 486, 496 (Utah 2010) (noting that the IIED statute of limitations is four years); Blackburn Supp. App. at 11. We see no "mistake concerning the proper party's identity" such that the amendment would relate back, see Fed. R. Civ. P. 15(c)(1)(C), and, as a result, no abuse of discretion by the district court in denying this amendment.

After entry of summary judgment in favor of Blackburn, Plaintiffs again sought leave to amend their complaint, this time to add negligence and other torts of lesser fault. However, as Plaintiffs acknowledge, their request was a year late under the district court's scheduling order. Plaintiffs asked the district court to modify its scheduling order, but the district court refused. Plaintiffs' argument that they "could not have anticipated" the entry of summary judgment in favor of Blackburn is unpersuasive. App. Vol. V at 1433. The district court's denials of Plaintiffs' requests for leave to amend their IIED claim are affirmed.

In addition to its IIED claim against Blackburn, Plaintiffs alleged state law claims of wrongful death and assault and battery against Detective Norton. After resolving Plaintiffs' federal claims in favor of Defendants, the district court declined to retain supplemental jurisdiction and dismissed these claims without prejudice. We review that decision for abuse of discretion. Exum v. U.S. Olympic Comm., 389 F.3d 1130, 1139 (10th Cir. 2004). Plaintiffs provide no

29

basis for a conclusion that the district court abused its discretion in failing to retain jurisdiction over these state law claims.

*5. Sanctions for spoliation of evidence*

Plaintiffs appeal the district court's denial of their requested sanctions for alleged spoliation of evidence. Plaintiffs sought default judgment and the application of adverse inferences against all individual and government Defendants, as well as lesser sanctions in the alternative. Sanctions for spoliation of evidence are reviewed for abuse of discretion. Burlington N. & Santa Fe Ry. Co. v. Grant, 505 F.3d 1013, 1032 (10th Cir. 2007). "[W]e accept the district court's factual findings unless they are clearly erroneous." Id.

A spoliation sanction is proper where: "(1) a party has a duty to preserve evidence because it knew, or should have known, that litigation was imminent, and (2) the adverse party was prejudiced by the destruction of the evidence." Turner v. Pub. Serv. Co. of Colorado, 563 F.3d 1136, 1149 (10th Cir. 2009) (quoting Burlington N. & Santa Fe Ry. Co. v. Grant, 505 F.3d 1013, 1032 (10th Cir. 2007)). The entry of default judgment or the imposition of adverse inferences require a showing of bad faith. Id. (adverse inferences); Lee v. Max Int'l, LLC, 638 F.3d 1318, 1321 (10th Cir. 2011) (default judgment). "Mere negligence in losing or destroying" evidence is not enough to support imposition of either of these harsh sanctions. Turner, 563 F.3d at 1149 (quoting Aramburu v. Boeing Co., 112 F.3d 1398, 1407 (10th Cir. 1997)).

30

Plaintiffs argue that they were prejudiced by Defendants' spoliation or complete loss of the following evidence: (1) Murray's testimony, because officers failed to administer life-saving aid to Murray at the scene; (2) the .380 caliber firearm attributed to Murray; (3) Detective Norton's .40 caliber firearm; and (4) any trace evidence that could have been recovered from the scene, Murray's body and clothes, or Detective Norton's body, clothes, or vehicle on the day of the shooting. Plaintiffs believe that this evidence would have tended to show that Murray did not shoot himself, but was instead shot by Detective Norton. Plaintiffs ask this court to find that the Defendants acted in bad faith because "[n]o [other] reasonable justification exists for Defendants' disregard for the evidentiary duties they were under." Aplt. Br. at 27.

With respect to preserving Murray's life, and therefore his testimony, the district court found, based on Dr. Leis' testimony, that Plaintiffs were not prejudiced because Murray's injuries were not survivable. We see no clear error in the district court's consideration of the medical facts, and therefore agree that the failure to administer aid did not result in prejudice to Plaintiffs' case.

Regarding the destruction of the .380 caliber weapon found near Murray, the district court did not abuse its discretion in denying sanctions because Defendants here lack the level of culpability required for the spoliation of evidence outside of their control. See Silvestri v. Gen. Motors Corp., 271 F.3d 583, 591 (4th Cir. 2001) (sanctioned party had access to evidence for his own

31

investigation, but did not notify other party); <u>Ehrenhaus v. Reynolds</u>, 965 F.2d 916, 921 (10th Cir. 1992) (listing culpability as a relevant factor in considering default judgment sanctions); <u>K-Con Bldg. Sys., Inc. v. United States</u>, 106 Fed. Cl. 652, 664 (Fed. Cl. 2012) (government allowed a witness to remove documents, and the witness then caused those documents to be destroyed). Once Agent Ashdown arrived, the FBI had exclusive jurisdiction over the investigation, and was entirely responsible for preserving the .380 caliber weapon as evidence and preventing its ultimate destruction. Neither Plaintiffs nor Defendants were notified in advance of the weapon's destruction.

Plaintiffs also contend the Defendants failed to preserve trace evidence that may have been recovered from Detective Norton's .40 caliber gun, such as blowback which would implicate it as the fatal weapon. Even if insufficient examination of Norton's gun may have prejudiced Plaintiffs, the district court did not abuse its discretion in finding that none of the Defendants here had a duty to preserve it. The persons with the most obvious responsibility for preserving that evidence, Agent Ashdown and Chief Jensen, are not parties to this litigation and therefore cannot be the subject of sanctions. It is arguable that Norton had an independent duty to preserve any trace evidence on his own firearm because he, independent of the FBI investigation, could reasonably have anticipated litigation. However, the district court's rejection of this theory does not amount to an abuse of discretion.

32

Finally, Plaintiffs request sanctions for spoliation of trace evidence from the scene of the shooting, Murray and Detective Norton's skin and clothing, and from Norton's vehicle. Plaintiffs' strongest support for the imposition of sanctions is the conduct of Deputy Byron,[8] who accompanied Murray to the hospital, was involved in removing Murray's clothes and taking samples which have been lost, tampered with his body, and fingered Murray's head wound—all before the medical examiner had an opportunity to examine Murray's body. Plaintiffs' and Defendants' experts agreed that these actions could have contaminated or removed trace evidence, and were unnecessary and inappropriate.

Despite how disturbing Deputy Byron's behavior was, the district court found no prejudice resulting from these acts. Dr. Leis testified that potential contamination from Byron's actions would not have changed his ultimate conclusion regarding Murray's cause of death. None of the blood improperly extracted before the official medical exam was analyzed, and so the district court reasoned there was no prejudice because it was not used against Plaintiffs. The

---

[8] Arguments regarding failure to swab for gunshot residue, search for bullets, or inspect Norton's car are much weaker. Defendants presented unrebutted testimony that gunshot residue tests are unreliable and law enforcement agencies have therefore ceased using them. A gunshot residue test on Detective Norton would have added nothing to the investigation because he admitted to firing his weapon twice. The district court found that none of the Defendants had a duty to document the scene because it was within the province of the FBI. Plaintiffs have also failed to articulate what relevant evidence might have been gleaned from investigating Norton's vehicle.

33

district court further noted that Plaintiffs failed to point to any specific relevant evidence that would have been found on Murray's clothing. The district court concluded Plaintiffs had not established any prejudice resulting from the handling of Murray's body after his death and therefore denied Plaintiffs' request for sanctions. Although these acts appear at best sloppy and unorthodox, and at worst suspicious, the district court's denial of sanctions was not an abuse of discretion.

*6. Taxation of costs*

After the district court entered final judgment, the state (Highway Patrol and DWR officers) and municipal (remaining individuals and municipalities) Defendants successfully sought costs, and Plaintiffs sought review of the clerk's taxation of costs. After Plaintiffs and Defendants submitted briefs on the costs issue, the district court referred the motion to a magistrate judge pursuant to 28 U.S.C. § 636(b)(1)(A). The magistrate judge issued a memorandum decision and order denying Plaintiffs' motion for review and upholding the clerk's entry of costs. This order was not in the form of a recommendation, and was not reviewed or adopted by a district judge. The clerk then entered an amended final judgment, to include the costs. The state and municipal Defendants argue that this court lacks jurisdiction to review the taxation of costs because the magistrate judge's ruling is not an appealable order.

Plaintiffs had fourteen days to object from the date of the magistrate

34

judge's order under a § 636(b)(1)(A) referral. Fed. R. Civ. P. 72(a). Plaintiffs "may not assign as error a defect in the order not timely objected to." Id. Moreover, "[u]nder 28 U.S.C. § 636(b)(1)(A), a magistrate judge may not issue a final order directly appealable to the court of appeals." S.E.C. v. Merrill Scott & Assocs., Ltd., 600 F.3d 1262, 1269 (10th Cir. 2010) (quoting Hutchinson v. Pfeil, 105 F.3d 562, 566 (10th Cir. 1997)).[9] We therefore lack appellate jurisdiction over the magistrate judge's order denying reconsideration of costs, and dismiss.

**IV**

With the exception of the taxation of costs under Case No. 14-4144, the judgment of the district court is affirmed in Case Nos. 14-4040 and 14-4144. Defendants' motion to dismiss for lack of jurisdiction is granted with regard to the taxation of costs, and denied with respect to all other issues. Plaintiffs' motion to seal Volume XIX of the record is granted. Plaintiffs' motion to file a supplemental appendix is denied.

---

[9] The grant of authority under 28 U.S.C. § 636(c) includes the ability to issue final appealable orders, but requires consent of the parties. 28 U.S.C. § 636(b) and (c)(3); Fed. R. Civ. P. 73(c); Phillips v. Beierwaltes, 466 F.3d 1217, 1220–22 (10th Cir. 2006). The parties here did not consent, either expressly or impliedly, and so even construed under § 636(c), the magistrate judge's order is not appealable.