FILED
United States Court of Appeals
Tenth Circuit

February 5, 2019

Elisabeth A. Shumaker
Clerk of Court

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

_____

GILBERT SERRANO,

    Plaintiff - Appellant,

v.

UNITED STATES OF AMERICA; SEAN
COZART and SERGIO HERIMOSILLO,
in their individual and official capacities as
Deputy United States Marshals; MARTIN
ARAGON, in his individual and official
capacity as Special Deputy United States
Marshal; JOHN DOES 1, 2, 3, & 4; JANE
DOES 1, 2, & 3, in their individual and
official capacities as Deputy United States
Marshals,

    Defendants - Appellees.

No. 18-2006
(D.C. No. 1:16-CV-00040-NF-MLC)
(D. N.M.)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **BACHARACH**, **PHILLIPS**, and **EID**, Circuit Judges.
_____

After being shot and then manhandled and hit while being apprehended by

United States Marshals Service (USMS) personnel, Gilbert Serrano brought suit

_____

[*] After examining the briefs and appellate record, this panel has determined
unanimously to honor the parties' request for a decision on the briefs without oral
argument. _See_ Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G). The case is therefore
submitted without oral argument. This order and judgment is not binding precedent,
except under the doctrines of law of the case, res judicata, and collateral estoppel. It
may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1
and 10th Cir. R. 32.1.

under *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971), and the Federal Tort Claims Act (FTCA), 28 U.S.C. §§ 1346(b), 2671-2680. The district court granted summary judgment to the individual defendants on the *Bivens* claims and to the United States on the FTCA claims. Serrano appeals. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm.

## BACKGROUND

In February 2014, Serrano absconded from parole. In early March, he reportedly fired a gun at the home of his former girlfriend (his child's mother) and threatened to kill her new partner.[1] An arrest warrant issued on charges of aggravated assault with a deadly weapon, aggravated assault against a household member, child abuse, and felon in possession of a firearm, and the USMS assumed primary responsibility for arresting Mr. Serrano.

The USMS fugitive task force team was led by defendant Deputy Marshal Sean Cozart. It also included defendants Deputy Marshal Sergio Hermosillo and Special Deputy Marshal Martin Aragon, as well as non-defendants Special Deputy Marshal Emily Hunt and Deputy Marshal Ben Segotta. The team was aware of Serrano's criminal history, which included possession of a controlled substance, aggravated fleeing a law enforcement officer, receipt of firearms by a felon, armed

---

[1] As the district court noted, Serrano disputes the truth of certain underlying events, such as what happened at his former girlfriend's house. But he does not dispute what information the USMS team received. It is the information the team received, not the truth of the underlying circumstances, that is material to our analysis.

robbery, and battery on a police officer. He was believed to be a member of a gang, and Cozart also learned that Serrano once had been involved in an hours-long standoff with a SWAT team. Further, Serrano's recent girlfriends told Cozart that Serrano would flee, and that he had said he was not going back to prison and would rather commit suicide by cop.

On April 1, 2014, Cozart and Hunt found Serrano's truck at his sister's house. Serrano and another man took the truck to a commercial building in Albuquerque. Cozart and Hunt followed while remaining in communication with the rest of the team. When Serrano parked in the building's lot, the deputies parked across the street and waited for the rest of the team. Events then moved rapidly; from start to finish, the apprehension took around three minutes.

After the passenger went into the building and came back, Serrano's truck started backing up. The team moved into action. Aragon had already parked two spaces over. Cozart activated his emergency lights, drove across the street, and parked at the passenger-side front corner of the truck. Segotta parked closely behind the truck, partially blocking it from the rear. All the deputies left their vehicles: Aragon went toward the front driver's side of the truck; Cozart went toward the front passenger side of the truck; Hunt was at Cozart's right; and Segotta was behind the truck. The deputies had drawn their guns, and they wore vests and/or USMS badges.

The truck had backed into the front of Segotta's vehicle. It then was stopped, and Cozart heard it stop running. He saw Serrano fumbling for something underneath the dash. Although the deputy did not know it, the truck was stalled, and

3

Serrano was working on getting it going again. Cozart then heard the truck's engine start, and he saw Serrano put his hands on the steering wheel and turn the wheel toward Aragon. Aragon also thought Serrano's attention was focused on him. Believing that Serrano could not back up because of Segotta's vehicle, and therefore he was going to run Aragon and Hunt down, Cozart fired two shots. The first skipped off the roof of the truck, but the second shot went through the windshield. Serrano's truck started moving backward, pushing Segotta's vehicle out of the way and crossing curbs, sidewalks, and street before coming to rest.

The bullet had hit Serrano in the head, creasing his skull, but he remained conscious and moving. Having followed the truck, the team saw Serrano reaching for something in the center console. Cozart and Hunt ordered him to stop, but he did not comply. Not knowing that he was trying to get a cigarette, Aragon was concerned that he might have a weapon. He yanked Serrano out of the truck and took him to the ground. Serrano fell with his hands underneath his chest. Aragon placed his knee in Serrano's lower back and tried to get control of his arms. According to Serrano, Aragon struck Serrano repeatedly on the back of the head both before and after grabbing Serrano's right arm, while calling him "[expletive] little punk" and repeatedly yelling "[y]ou want to go out with a bang?" Aplt. App., Vol. 3 at 284-85 (internal quotation marks omitted). Serrano testified that he had lost control of the left side of his body from being shot and could not comply with demands to present his left arm. His left arm and hand remained underneath his body.

4

Hermosillo did not arrive in time to join the initial part of the operation, but he saw the deputies advancing on Serrano's truck when it stopped. Parking behind the truck, he saw Aragon on the ground with Serrano. He assisted Aragon, grabbing Serrano's left arm. With both arms under control, the deputies handcuffed Serrano. The team rendered first aid before Serrano was taken to a hospital.

Serrano sued Cozart, Aragon, and Hermosillo under *Bivens* for violating his constitutional rights—Cozart for shooting him, Aragon for pulling him out of the truck and hitting him, and Hermosillo for failing to stop Aragon from hitting him. He also sued the United States under the FTCA for various torts. The district court awarded qualified immunity to the individual defendants on the *Bivens* claims, holding that Serrano had not demonstrated that the force they used was objectively unreasonable in violation of the Fourth Amendment.[2] It further granted summary judgment to the United States on the FTCA claims, holding that the individual defendants' use of force was privileged as against claims of assault and battery and was not negligent, grossly negligent, or reckless. Serrano appeals.

---

[2] Mr. Serrano's second amended complaint asserted that the individual defendants violated his rights under the Fourth, Fifth, Eighth, and Fourteenth Amendments. But the district court analyzed his arguments solely under the Fourth Amendment excessive-force standard, and he does not challenge that decision. *See Graham v. Connor*, 490 U.S. 386, 395 (1989) (holding that "*all* claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard").

## ANALYSIS

"We review the grant of summary judgment de novo. We view the facts in the light most favorable to the nonmovant and draw all reasonable inferences in the nonmovant's favor." *Jones v. Norton*, 809 F.3d 564, 573 (10th Cir. 2015) (citation omitted). "Summary judgment is appropriate only if there is no genuine dispute as to any material fact," with "material fact" meaning a fact that "could have an effect on the outcome of the lawsuit." *Id.* (internal quotation marks omitted). "A dispute over a material fact is 'genuine' if a rational jury could find in favor of the nonmoving party on the evidence presented." *Id.* (internal quotation marks omitted).

## I. *Bivens* Claims

Serrano asserts that there are genuine disputes of material fact as to the reasonableness of the force used, and that those disputed facts preclude granting summary judgment to Cozart, Aragon, and Hermosillo on his *Bivens* claims.

### A. Qualified Immunity Standards

"The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (internal quotation marks omitted). To overcome an official's entitlement to qualified immunity, a plaintiff must establish that the defendant violated a constitutional right, and that the right was "clearly established" at the time of the violation. *Id.* at 232 (internal quotation marks

6

omitted). "Failure on either qualified immunity element is fatal to the plaintiff's cause." *Kerns v. Bader*, 663 F.3d 1173, 1180 (10th Cir. 2011).

Although it is within the court's sound discretion to determine which of the two elements to address first, *Pearson*, 555 U.S. at 236, "the Supreme Court has recently instructed that courts should proceed directly to, 'should address only,' and should deny relief exclusively based on the second element" in certain circumstances, *Kerns*, 663 F.3d at 1180 (quoting *Camreta v. Greene*, 563 U.S. 692, 707 (2011)). In this case, the district court considered only whether Serrano had established a violation of his Fourth Amendment rights, concluding that he had not. The district court's approach makes sense given that the district court also had to consider the reasonableness of the team's use of force for purposes of Serrano's FTCA claims. We therefore follow suit.

In considering whether an officer is entitled to qualified immunity, we "consider[] only the facts that were knowable to the defendant officers." *White v. Pauly*, 137 S. Ct. 548, 550 (2017) (per curiam). A government official can claim qualified immunity even if the official was mistaken about the facts or the law. *See Pearson*, 555 U.S. at 231.

## B.     Fourth Amendment Standards

"Determining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham v. Connor*,

7

490 U.S. 386, 396 (1989) (internal quotation marks omitted). "[T]he right to make an arrest . . . necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Id.*

*Graham* instructs that the "proper application" of the Fourth Amendment's reasonableness test "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* This court has identified other relevant factors: "(1) whether the officers ordered the suspect to drop his weapon, and the suspect's compliance with police commands; (2) whether any hostile motions were made with the weapon towards the officers; (3) the distance separating the officers and the suspect; and (4) the manifest intentions of the suspect." *Estate of Larsen ex rel. Sturdivan v. Murr*, 511 F.3d 1255, 1260 (10th Cir. 2008). "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396. The inquiry is objective: "the question is whether the officers' actions are objectively reasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.* at 397 (internal quotation marks omitted).

Further, "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of

8

force that is necessary in a particular situation." *Id.* at 396-97. "The Fourth Amendment standard is reasonableness, and it is reasonable for police to move quickly if delay would gravely endanger their lives or the lives of others." *City & Cty. of San Francisco v. Sheehan*, 135 S. Ct. 1765, 1775 (2015) (internal quotation marks omitted).

## C.    Analysis

### 1.    Deputy Cozart

The district court held that the shooting was an objectively reasonable use of force because Cozart reasonably believed that Serrano presented an imminent deadly threat to USMS personnel. Serrano argues that the district court erred because when Cozart fired, the truck was stationary, and therefore there is a disputed issue of material fact as to whether it posed a risk to the deputies. We agree with the district court that there is no genuine issue of material fact and the shooting was an objectively reasonable use of force in the circumstances.

"The use of deadly force is not unlawful if a reasonable officer would have had probable cause to believe that there was a threat of serious physical harm to himself or others. Thus, if threatened by [a] weapon (which may include a vehicle attempting to run over an officer), an officer may use deadly force." *Thomas v. Durastanti*, 607 F.3d 655, 664 (10th Cir. 2010) (citations omitted). "Indeed, even if an officer reasonably, but mistakenly, believed that a suspect was likely to fight back the officer would be justified in using more force than in fact was needed." *Estate of Larsen*, 511 F.3d at 1260 (alterations and internal quotation marks omitted).

9

Cozart had probable cause to believe that there was a threat of serious physical harm to the deputies. The USMS team was seeking to apprehend Serrano for serious crimes. The deputies had activated their emergency lights and wore vests and/or USMS badges, which would give reasonable officers the belief that the subject of the arrest knew they were law enforcement officers. Cozart knew that Serrano had a history of fleeing from and opposing law enforcement officers, and he had been informed that Serrano would flee if faced with returning to prison. Serrano's truck had been backing out when it made contact with Segotta's vehicle. The engine had turned off, but then Serrano got it started again. Cozart saw Serrano put both hands on the steering wheel and perceived him to focus on Aragon and turn the steering wheel toward him. It was reasonable for Cozart to believe that Serrano could not drive backwards because of Segotta's vehicle and that his only way out was to drive forward. And Cozart had only moments to react to the circumstances confronting him.

In these circumstances, we disagree with Serrano's proposition that "a stationary vehicle cannot be used as a weapon and would not constitute a threat of death or great bodily harm." Aplt. Opening Br. at 20. If the truck had remained stalled and therefore could not move, we might agree with Serrano's proposition. *Cf. Zia Tr. Co. ex rel. Causey v. Montoya*, 597 F.3d 1150, 1155 (10th Cir. 2010) (declining to state that officer acted reasonably in shooting driver of van when the van was "obviously stuck on a retaining wall"). But viewing the facts from Cozart's perspective, Serrano successfully worked to get the truck started again. Then, with

10

the engine running, he placed his hands on the wheel and turned it. At that point, the truck could become an active weapon in the short amount of time it would take to press the gas pedal—less than a second. All the deputies were on foot close to the truck, and "it goes without saying that an officer in close quarters is no match for a two-ton vehicle." *Thomas*, 607 F.3d at 665. With events moving so rapidly and "in these close quarters, a reasonable officer could conclude that his or her life was in danger and employ deadly force to stop the vehicle." *Carabajal v. City of Cheyenne*, 847 F.3d 1203, 1209 (10th Cir.), *cert. denied*, 138 S. Ct. 211 (2017).[3]

The two Eleventh Circuit cases Serrano relies on are factually distinguishable. In both *Morton v. Kirkwood*, 707 F.3d 1276, 1281-82 (11th Cir. 2013), and *Harrigan v. Metro Dade Police Department Station No. 4*, 636 F. App'x 470, 474 (11th Cir. 2015) (per curiam) (unpublished), the officers had no prior knowledge of the plaintiff and no probable cause to believe that he was dangerous. But Cozart knew Serrano to be a felon with a history of non-compliance with law enforcement and believed he intended to flee rather than submit to arrest. Moreover, in *Morton*, the plaintiff testified that he put his car in park and raised both hands. 707 F.3d at 1282. Here, to the contrary, Serrano does not dispute that he got his truck running again and placed his hands on the steering wheel, looking for a way out.

_____

[3] *Thomas* further states that "[e]ven if [the agent] reasonably believed that it was necessary to use deadly force, we must still determine whether he recklessly or deliberately brought about the need to use such force." 607 F.3d at 667. Serrano's opening brief does not challenge the district court's rejection of his argument that the deputies were reckless in their use of the blocking maneuver, and there is no evidence in the record to suggest the maneuver was improper.

11

"The determination of qualified immunity remains heavily dependent on the claim in light of the unique circumstances of each case," *Carabajal*, 847 F.3d at 1211, and in this case Serrano has failed to establish that Cozart's firing two shots, hitting him with one, was a violation of his Fourth Amendment rights. The district court did not err in awarding Cozart qualified immunity.

### 2. Deputy Aragon

The district court held that Aragon's use of force, both in pulling Serrano from the truck and in striking him, was objectively reasonable. The district court noted that when the truck stopped, Serrano failed to follow the team's commands and fumbled for something in the console. Further, after being pulled from the truck he was not compliant with demands to put his hands behind his back. The district court stated that Aragon reasonably believed that Serrano had something in his hands and was purposefully not complying; there was no evidence that Aragon was, or should have been, aware that Serrano's injuries meant that he could not control the left side of his body. The district court also held that the medical evidence indicated that the strikes did not cause any significant injury or lasting damage. We agree with the district court's analysis.

*Graham* recognized that officers have the right to use some degree of physical coercion to effect an arrest. 490 U.S. at 396. But "[t]he degree of physical coercion that law enforcement officers may use is not unlimited." *Cortez v. McCauley*, 478 F.3d 1108, 1125 (10th Cir. 2007) (en banc). "[T]he excessive force inquiry evaluates the force used in a given arrest or detention against the force reasonably

12

necessary to effect a lawful arrest or detention under the circumstances of the case." *Id.* at 1126. We also must keep in mind, however, that "[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment." *Graham*, 490 U.S. at 396 (citation and internal quotation marks omitted).

It is not clear whether Serrano continues to challenge Aragon's pulling him out of the truck in addition to the strikes to the head. Assuming that he continues to maintain this aspect of his claim, the circumstances confronting Aragon involved a wanted felon, known to be non-compliant with law enforcement, believed to be armed and to have intent to flee or commit suicide by cop. That felon's truck had just pushed a USMS vehicle out of the way and driven backwards across curbs, sidewalks, and street before coming to a stop. Serrano was conscious and moving, but he refused to comply with the USMS team's commands and was fumbling for something in the center console of the truck. "It was not unreasonable for the officer[] to elect to remove him from the vehicle under the circumstances, his injuries notwithstanding." *Carabajal*, 847 F.3d at 1212.

As for the strikes to the head, Serrano points out that "[i]t is clearly established that a law enforcement officer may not use force on a compliant suspect, under the officer's control and not resisting arrest." Aplt. Opening Br. at 21 (citing *Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1314-15 (10th Cir. 2002), and *Dixon v. Richer*, 922 F.2d 1456, 1462-63 (10th Cir. 1991)). He further relies on *Fisher v. City of Las Cruces*, 584 F.3d 888, 901 (10th Cir. 2009), in which this court held that "[i]t is long

13

established law of this and other circuits that a triable claim of excessive force exists where a jury could reasonably conclude that the officer handled a cooperating arrestee in a manner that the officer knew posed a serious risk of exacerbating the arrestee's injuries, which were themselves known to the officer."

Serrano, however, has failed to establish a genuine issue of disputed material fact as to whether he was compliant and under Aragon's control when Aragon struck him. To the contrary, Serrano acknowledges that he did not follow Aragon's demands to present his left arm. He says that he physically could not comply, but Aragon had no way of knowing that Serrano was not deliberately disobeying (for example, the district court found no evidence that Serrano told Aragon he could not move the left side of his body). It was reasonable for Aragon to fear that Serrano may have grabbed a weapon from the console and was hiding it under his body.

Serrano suggests that he was totally under Aragon's control once Aragon had handcuffed his right wrist. It does not necessarily follow, however, that placing one hand in handcuffs renders an arrestee totally under an officer's control. *See, e.g.*, *Malone v. Carpenter*, 911 F.3d 1022, 1026 (10th Cir. 2018) (officer placed handcuff on arrestee's right wrist before the arrestee broke free from the officer's hold and killed him).

Serrano also asserts that there are genuine issues of material fact as to Aragon's motives in striking him. He states that the strikes to the back of the head were "designed to inflict maximum damage upon Mr. Serrano," and he points out that Aragon called him a "'[expletive] little punk'" and repeatedly yelled, "'[y]ou want to

14

go out with a bang?'" Aplt. Opening Br. at 22, 23. He argues that this evidence shows Aragon's "purpose was to punish, rather than subdue, Mr. Serrano." *Id.* at 23. But as the district court held, *Graham* makes it clear that "the question is whether the officers' actions are objectively reasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." 490 U.S. at 397 (internal quotation marks omitted). With the facts viewed in the light most favorable to Serrano failing to show that he was compliant and under control when Aragon hit him, the strikes were objectively reasonable, and Aragon's intent in delivering them is irrelevant.

Finally, Serrano also argues that the district court erred in relying on the medical evidence to conclude that Aragon did not employ excessive force. *See* Aplt. App., Vol. 3 at 432 (noting "the medical records do not indicate that he suffered any injury to his head or face, other than the shrapnel and the wound from the bullet"; [t]here were no obvious abnormalities to his face, right ear, left ear, left eye, right eye, nose, neck, chest or upper back"; and "[t]he record does not contain any indication that Serrano was injured by any strikes he received from Deputy Aragon or that his injuries were exacerbated"). Serrano interprets this discussion as a finding that "his injuries . . . were insufficient to support his excessive force claim," Aplt. Opening Br. at 24, and he takes issue with that finding, asserting that the Fourth Amendment protects interests beyond physical harm. The district court's discussion, however, is more naturally interpreted not as a legal conclusion as to the sufficiency of Serrano's claim, but as a factual finding that Aragon's strikes were not unduly

15

forceful (and therefore were not excessive), given that Serrano had failed to show that they caused any lasting injury.

For these reasons, Serrano has failed to establish that Aragon's use of force violated his Fourth Amendment rights. The district court did not err in granting Aragon qualified immunity.

### 3. Deputy Hermosillo

Serrano claims that Hermosillo is liable not for any force he himself applied, but for failing to intervene to prevent Aragon from hitting him. The district court held that because Aragon did not use excessive force, Hermosillo could not be liable for failing to intervene.

"[A] law enforcement official who fails to intervene to prevent another law enforcement official's use of excessive force may be liable under [42 U.S.C.] § 1983," *Mick v. Brewer*, 76 F.3d 1127, 1136 (10th Cir. 1996), and therefore under *Bivens*, *see Pahls v. Thomas*, 718 F.3d 1210, 1225 (10th Cir. 2013) (recognizing that *Bivens* is "the federal analog to a § 1983 suit"). Serrano points out that Hermosillo testified that he was "[s]houlder to shoulder" with Aragon while they were struggling to get both of Serrano's arms under control and handcuffed. Aplt. App., Vol. 3 at 321. Thus, he asserts, a reasonable jury could conclude that Hermosillo could have intervened. We need not consider these assertions. As the district court held, if Aragon did not use excessive force—which we have held was the case—then Hermosillo cannot be liable for failing to intervene to prevent Aragon from using

16

excessive force. *See Jones*, 809 F.3d at 576. Accordingly, the district court did not err in awarding qualified immunity to Hermosillo.

## II. FTCA Claims

Under the FTCA, the United States is liable for certain torts committed by the USMS officers, acting within the scope of their employment, to the same extent that New Mexico law would make a private person liable. 28 U.S.C. § 1346(b). Serrano argues that the United States should be liable for the torts of assault, battery, recklessness, gross negligence, and negligence.[4]

### A. Assault and Battery

Although the FTCA generally excepts claims of assault and battery from its waiver of immunity, that exception does not apply to claims of assault and battery "with regard to acts or omissions of investigative or law enforcement officers of the United States Government." 28 U.S.C. § 2680(h). Thus, Serrano can bring assault and battery claims regarding the deputies' actions under the FTCA.

The district court noted that New Mexico affords law enforcement officers making an arrest a privilege against assault and battery claims so long as they use only that force that is reasonably necessary. *See Alaniz v. Funk*, 364 P.2d 1033, 1034-36 (N.M. 1961); *Mead v. O'Connor*, 344 P.2d 478, 479-80 (N.M. 1959). Stating that New Mexico relies on factors similar to those set forth in *Graham*, the

---

[4] Serrano's second amended complaint also listed abuse of process and violations of his constitutional rights among his FTCA claims. The district court held that those claims failed because Serrano had not addressed or explained them, and Serrano does not challenge that determination on appeal.

17

district court granted summary judgment on the assault and battery claims for substantially the reasons it gave in concluding that the deputies had not used excessive force in violation of the Fourth Amendment.

New Mexico has adopted the use-of-force standards for arrests set out in the *Restatement (Second) of Torts*. *See State v. Johnson*, 930 P.2d 1148, 1151, 1154 n.3 (N.M. 1996). *Restatement* § 118 provides that "[t]he use of force against another for the purpose of effecting his arrest and the arrest thereby effected are privileged if all the conditions stated in §§ 119-132, in so far as they are applicable, exist." *Restatement (Second) of Torts* § 118 (Am. Law Inst. 1965). In this case, §§ 131 and 132 establish relevant conditions. Section 131 establishes a privilege for a use of deadly force in effecting an arrest under certain circumstances, including that the arrest is made under a warrant and "the actor reasonably believes that the arrest cannot otherwise be effected." *Id.* § 131. Section 132 provides that "[t]he use of force against another for the purpose of effecting the arrest or recapture of the other . . . is not privileged if the means employed are in excess of those which the actor reasonably believes to be necessary." *Id.* § 132.

In *Mead v. O'Connor*, 344 P.2d at 479, the New Mexico Supreme Court held that a police officer who ejected the plaintiff from a bar, breaking his leg in the process, may be entitled to a privilege against a claim of assault.

> [D]efendant was entitled to use such force as was reasonably necessary under all the circumstances of the case. Officers, within reasonable limits, are the judges of the force necessary to enable them to make arrests or to preserve the peace. When acting in good faith, the courts will afford them the utmost protections, and they will recognize the fact that emergencies

18

arise when the officer cannot be expected to exercise that cool and deliberate judgment which courts and juries exercise afterwards upon investigation in court. However, it devolves upon the jury, under the evidence in the case and proper instructions of the court, to resolve these questions.

*Id.* at 479-80.

Two years later, in *Alaniz v. Funk*, 364 P.2d at 1033, the New Mexico Supreme Court addressed the use of deadly force by officers effectuating an arrest. *Alaniz* involved officers who staked out the site of a cache of stolen firearms. *Id.* Officers pursued the suspects who came to take the firearms, and one officer shot at the fleeing car, killing the driver. *Id.* The court held that "[a]n officer may use force likely to result in death only in case it appears reasonably necessary to do so to effect an arrest or prevent an escape." *Id.* at 1034.[5] Approving the rule set forth in *Restatement* § 131, the court further held that "generally, the question of the reasonableness of the actions of the officer in using lethal force to apprehend a felon is a question of fact for the jury." *Id.* at 1035. But it then recognized that judgment as a matter of law was appropriate in that case because "the minds of reasonable men could not differ under the circumstances as they appeared to the defendant at the time of a shooting." *Id.*

Serrano's opening brief does not extensively discuss the New Mexico privilege. Beyond acknowledging that the privilege exists, he appears to suggest that

---

[5] Since *Alaniz*, New Mexico has updated its statute regarding when public officers' use of deadly force in effecting an arrest is justifiable homicide. *See* N.M Stat. Ann. § 30-2-6.

the district court erred in granting summary judgment on the assault and battery claims because an officer's subjective intent is relevant and a jury must determine whether the force used was reasonably necessary. As stated, New Mexico courts generally submit issues surrounding the privilege to a jury, but the New Mexico Supreme Court also has recognized that judgment as a matter of law may be appropriate. For substantially the reasons discussed with regard to the Fourth Amendment claims, as in *Alaniz* we are convinced that "the minds of reasonable men could not differ under the circumstances as they appeared to the defendant at the time of the shooting" (with regard to Cozart) or the manhandling and strikes to the head (with regard to Aragon). *Id.* We therefore affirm the grant of summary judgment to the United States on the assault and battery claims under the FTCA.

## B.       Negligence, Gross Negligence, and Recklessness

The district court also rejected Serrano's claims of negligence, gross negligence, and recklessness. After specifically discussing one of Serrano's allegations of negligence (the team's use of a blocking maneuver), the district court then held that, for the reasons it had already explained, the deputies were not negligent in the force they employed. On appeal, Serrano does not challenge the rejection of his blocking-maneuver argument. Instead, he asserts that he adequately showed the elements of negligence, gross negligence, and recklessness.

New Mexico's privilege for law enforcement officers applies not only to assault and battery claims, but also to negligence and recklessness claims. *See id.* at 1033-34. For substantially the same reasons that we affirm the district court's

20

judgment on the assault and battery claims, we also affirm summary judgment in favor of the United States on the remaining tort claims.

## CONCLUSION

The district court's judgment is affirmed.

Entered for the Court


Allison H. Eid
Circuit Judge